Kenneth M. Sigelman, Esq. (SBN: 100238)
E-Mail: ken@sigelmanassociates.com
Max A. Gruenberg, Esq. (SBN: 345453)
E-Mail: max@sigelmanassociates.com
KENNETH M. SIGELMAN & ASSOCIATES
1901 1st Ave., 2nd floor
San Diego, California 92101
Telephone: (619) 238-3813
Facsimile: (619) 238-1866

Jonathan R. Ehtessabian, Esq. (SBN. 243211)
jon@jrelawfirm.com
JRE LAW FIRM, APC
600 West Broadway, Suite 700
San Diego. CA 92101
Telephone: (619) 207-4060
 Facsimile: (619) 314-8082

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| XBN, a Minor, By and Through His Guardian Ad Litem, ALONDRA NUNEZ, and ALONDRA NUNEZ, Individually,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; and DOES 1 through 20, Inclusive,<br><br>Defendants. | Case No. 1:24-cv-00431-HBK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT PURSUANT TO FRCP RULE 56**<br><br>Date: August 16, 2024<br>Time: 1:00 p.m.<br>Location: Courtroom 2, Eighth Floor<br>United States Courthouse<br>2500 Tulare Street<br>Fresno, CA 93721 |

## I. PROCEDURAL BACKGROUND

There is a related case to this matter, Case No. 1:23-CV-01453-HBK, that was removed from state court precipitously by the United States of America on October 10, 2023. **(See Ex. 1, Notice of Removal).** The scheduling conference in that related matter has been stayed while Plaintiffs followed the appropriate procedure pursuant to the Federal Tort Claims Act.

The related case involves the same plaintiffs, and arises out of substantially related facts, as plaintiffs' claims against the U.S.A. (Shimeka Banks, M.D. as a deemed federal employee). Plaintiffs' claim injuries and damages as a result of defendants' negligent prenatal care and/or labor and delivery care of plaintiff Alondra Nunez during her pregnancy with, and delivery of, plaintiff Xavien Burns-Nunez. Dr. Banks was involved in plaintiffs' care during one of Ms. Nunez' prenatal visits to defendant Kawaeh Health Medical Center. Initially, Dr. Banks was named as a defendant in an action that included all the defendants in the related case, which was filed in state court in the Tulare County Superior Court, State of California. Subsequently, plaintiffs learned that, at the time that Dr. Banks provided services to plaintiffs, she was in the course and scope of "deemed" employment by the United States, because Altura Health, the clinic that employed her, was a Federally Qualified Health Center and "deemed" employee of the United States pursuant to 42 U.S.C. §233(b) as amended by the Federally Supported Health Centers Assistance Act of 1995. Accordingly, on August 4, 2023, plaintiffs filed a Form SF 95 administrative tort claim with DHHS pursuant to the requirements of the Federal Tort Claims Act. Plaintiffs' administrative tort claim was received by DHHS on August 10, 2023. On October 10, 2023, before DHHS had taken final action with regard to plaintiffs' administrative tort claim, the United States removed the state court action to the related Court (Case No. 1:23-CV-01453-HBK). The removal was precipitous, because, since (1) final action on the administrative tort claim had not been taken by DHHS, or (2) six months had not elapsed from DHHS' receipt of the administrative tort claim, this Court lacked subject matter jurisdiction as to the United

States. In recognition of that, plaintiffs dismissed the United States, only, as a defendant in that related action, without prejudice, pursuant to the provisions of F.R.C.P. 41(a)(1)(A)(I). After receiving denial of plaintiffs' administrative tort claim by DHHS, on March 20, 2024, Plaintiffs filed the instant action in this Court pursuant to the provisions of the Federal Tort Claims Act as against the United States. The understanding was, once the United States had the opportunity to answer the complaint, plaintiffs would move to consolidate the newly filed action against the United States with the pre-existing related action. (**See Ex. 2, Joint Status Report and Motion to Further Continue Mandatory Scheduling Conference in Case No. 1:23-CV-01453-HBK**).

Despite knowing the plan had always been to comply with the necessary jurisdictional procedure in order to depose Dr. Banks to obtain the necessary information determine the extent of her liability, Defendant U.S.A. instead chose to file a premature summary judgment motion. Plaintiff have also been forthright with defense counsel from the inception that, if Dr. Banks' deposition reveals the medical information available to her justified her 8/21/21 discharge order, then Plaintiffs would dismiss the U.S.A. and move to remand the case back to state court against the remaining defendants. (**See Ex. 3, Party Email Correspondence**).

## II.   STATEMENT OF RELEVANT FACTS

Alondra Nunez was admitted to Kaweah Delta Medical Center on 9/1/21 at 39 weeks' gestation after being seen as an outpatient earlier that day with a urine dipstick test revealing 4+ protein, swelling in the hands, face, and lower extremities, and markedly elevated blood pressure of 159/90. (**See Decl. of Scott A. Bailey, M.D. ¶4**). Her prenatal course was also notable for gestational diabetes. The admitting diagnosis was severe preeclampsia (based on the protein in the urine, the swelling of the hands, face, the lower extremities, and the markedly elevated blood pressure). Severe preeclampsia can be life-threatening to mother and/or baby. One of the risks is placental abruption, which means separation of the placenta from the uterine wall, leading to

heavy bleeding with associated complications of the mother, and potential oxygen deprivation, hypoxic/ischemic brain injury, and/or death of the baby. (**See Bailey Decl. ¶4**).

Per the medical records, the plan was to admit Ms. Nunez to the hospital and proceed with emergency cesarean section. At the time of the emergency C-section, the diagnosis of placental abruption was confirmed based on "floating placenta" and "plenty of blood clots came out" being described in the operative report. (**See Bailey Decl. ¶4**). The placental pathology report described a subchorionic hematoma, (collection of blood), consistent with the clinical history of abruption. Per the medical records, XBN was born with no heart rate or respiratory effort and was pale. His Apgar scores were 0, 0, 4, 4, and 7 (out of a possible total of 10) at 1, 5, 10, 15 and 20 minutes of life respectively. Cord blood gas revealed a pH less than 7, and an unmeasurable base excess, indicative of severe metabolic acidosis. Follow-up blood gases at roughly 3 and 5 hours of life remained significantly acidotic per the medical records. At Kaweah Delta, XBN was diagnosed with neonatal depression. The plan was to transfer him to Children's Hospital Stanford for body cooling. (**See Bailey Decl. ¶4**).

At Lucile Packard, the consulting pediatric neurologist noted concern for hypoxic-ischemic encephalopathy, which means brain injury due to lack of oxygen. While Dr. Bailey would defer to experts in other specialties to comment on the precise nature and extent of XBN's brain injury, based on his education, training and experience as an obstetrician/gynecologist, it is Dr. Bailey's opinion to a reasonable medical probability that XBN's depressed condition at birth and hypoxic ischemic encephalopathy are directly related to the placental abruption suffered by Ms. Nunez. (**See Bailey Decl. ¶4**). It is also Dr. Bailey's opinion, to a reasonable medical probability, that the placental abruption and resulting complications to Ms. Nunez and XBN were the results of poorly controlled/ inadequately treated maternal blood pressure during Ms. Nunez's prenatal course, leading to preeclampsia and ultimately severe preeclampsia, which were not timely recognized and/or treated. The link between severe

preeclampsia and placental abruption is well known among obstetrician/gynecologists. (**See Bailey Decl. ¶4**).

According to Dr. Bailey's preliminary evaluation, the prenatal records from Kaweah Delta Health raise significant questions regarding prenatal management of Ms. Nunez' blood pressure/pre-eclampsia. (**See Bailey Decl. ¶5**). Based on the records, Dr. Banks was noted as the attending physician in connection with an unscheduled visit by Ms. Nunez to OB Triage in Labor and Delivery at Kaweah Delta Medical Center on 8/21/21 (11 days before delivery). There is a "communication order" ordered by Dr. Banks at 11:01 PDT which was entered by Brandie Mello, R.N. at 11:10 PDT which states "Review previous records if available." Also, per the records, Dr. Banks ordered an external tocodynamometer (a uterine contraction monitoring device), an external fetal heart monitor, and "vital signs" at 11:10 PDT, all of which were entered in the record by Nurse Mello at the same time. Nurse Mello entered an OB Triage note at 11:15 PDT indicating that Ms. Nunez came to the hospital that day because of "decreased fetal movement." (**See Bailey Decl. ¶5**).

The records document a phone conversation between Dr. Banks and Nurse Mello, which Nurse Mello recorded at 11:45 PDT. (**See Bailey Decl. ¶6**). The "Information Provided to Clinician" was noted to be as follows: "Adhoc, US, Toco. Fetal movement present." Per the record, the "Response from Clinician" states "See provider orders." The only provider order in the record after 11:45 PDT is an order by Dr. Banks entered by Nurse Mello at 11:52 PDT which reads "Discharge Patient." Dr. Banks co-signed this order on 8/29/21 at 06:51 PDT, per the record. While the records do not appear to include a complete set of vital signs (temperature, pulse, blood pressure, and respirations), there is a blood pressure for 8/21/21 of 132/84 entered in a section titled "Prenatal Exam and Notes," which section is re-printed numerous times throughout the 2294-page pdf medical chart from Kaweah Delta Medical Center. There is no mention of who measured that blood pressure, or what time it was taken. While the record documents an abnormal finding of 2+ protein in the urine (any protein in the urine

during pregnancy is abnormal) three days earlier, on 8/18/21, and 1+ protein in the urine on 8/11/21, there is no record of urine protein being checked on 8/21/21. Despite the fact that a blood pressure of 132/84 is considered Stage 1 hypertension according to published ACOG Guidelines, there is nothing in the records indicate that the blood pressure was ever re-checked at any time while Ms. Nunez was in OB triage on 8/21/21. (**See Bailey Decl. ¶6**).

Per Dr. Bailey's preliminary evaluation, the standard of care required Dr. Banks, as the attending physician, to inquire of Nurse Mello what the vital signs were, and, after being told what the blood pressure was, that the blood pressure the rechecked to see if it was still elevated. Additionally, if Dr. Banks was aware that the blood pressure was elevated, the standard of care required her to order that the nurse checked the urine protein as well, in order to determine if Ms. Nunez whether developing preeclampsia. (**See Bailey Decl. ¶6**).

Dr. Bailey determined he needed more information from Dr. Banks and Nurse Mello before he could make a conclusive determination on whether Dr. Banks met the standard of care. The medical records, alone, were insufficient. (**See Bailey Decl. ¶7**). There is information that would need to be elicited during the depositions of Dr. Banks, Nurse Mello, and suitably knowledgeable representatives from Kaweah Delta Health, and Altura Health (on information and belief, Dr. Banks' then-employer) on a number of subjects, which is critical to Dr. Bailey finalizing his opinions as to whether or not Dr. Banks met the standard of care with regard to her involvement with Ms. Nunez on 8/21/21. (**See Bailey Decl. ¶7**). At a minimum, those subjects include the following: (1) everything that Nurse Mello and Dr. Banks recall saying to one another regarding Ms. Nunez on 8/21/21; (2) which, if any, of Ms. Nunez' prior medical records were reasonably available to Dr. Banks on 8/21/21; (3) where Dr. Banks was physically located relative to Kaweah Delta Medical Center on 8/21/21 and when, if at all, she was present at Kaweah Delta Medical Center on 8/21/21; (4) the scope of Dr. Banks' responsibilities with regard to Kaweah Delta OB Triage patients as set forth in any

contractual agreement between Altura Health and/or Dr. Banks and Kaweah Delta Medical Center/Kaweah Delta Health; and (5) what communications, if any, Dr. Banks had at any time with Ms. Nunez' regular prenatal providers at Kaweah Delta Health. (**See Bailey Decl. ¶7**). Based on the single elevated blood pressure reading, and the lack of a urine dipstick test, during Ms. Nunez' visit, Dr. Bailey believed there was a reasonable basis to believe that the further information to be elicited as described above will establish one or more standard of care violations by Dr. Banks that were a substantial factor in causing harm to Ms. Nunez and XBN. Of course, that belief cannot be confirmed or ruled out until those depositions are taken and reviewed. (**See Bailey Decl. ¶7**).

### III.   LEGAL STANDARD

If a party is unable to address the moving party's assertions of fact as required by FRCP 56(c), the court may "continue the hearing to provide an opportunity to address the facts in question properly." (*See FRCP 56(e)(1)*).

If the party opposing summary judgment shows (by affidavit or declaration) that, for specified reasons, it cannot present facts essential to justify its opposition,

> "the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order." (*See FRCP 56(d)*).

The purpose of this is to prevent the opposing party from being "railroaded" by a premature motion for summary judgment. (See <u>Celotex Corp. v. Catrett</u>, (1986) 477 US 317, 106 S.Ct. 2548, 2554; <u>Rivera-Torres v. Rey-Hernández</u> (1st Cir. 2007) 502 F3d 7, 10—rule provides useful safety valve "against judges swinging the summary judgment axe too hastily").

The requirements to obtain postponement or denial for further discovery, considerations in the opposing party's declaration include the following:

/ / /

- facts indicating a *likelihood* that controverting evidence exists as to a material fact;
- *specific reasons* why such evidence was not discovered or obtained earlier in the proceedings (i.e., "good cause");
- the steps or procedures by which the opposing party proposes to *obtain* such evidence within a *reasonable time*; and
- an explanation of *how those facts will suffice* to defeat the pending summary judgment motion (i.e., to rebut the movant's allegations of no genuine issue of material fact). (See <u>Tatum v. City & County of San Francisco</u> (9th Cir. 2006) 441 F3d 1090, 1101; <u>Trask v. Franco</u> (10th Cir. 2006) 446 F3d 1036, 1042; <u>In re PHC, Inc. Shareholder Litig.</u> (1st Cir. 2014) 762 F3d 138, 143-144 — Rule 56(d) requirements can be summarized as "authoritativeness, timeliness, good cause, utility, and materiality").

A lesser showing of specificity may be allowed *before any discovery has taken place,* because the party making a Rule 56(d) motion "cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not been laid." (See <u>Burlington Northern Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation</u>, (9th Cir. 2003) 323 F3d 767, 774).

## IV. LEGAL ARGUMENT

### A. This Summary Judgment Motion Should be Denied or Continued

Summary judgment should be denied, or the hearing date continued, because Plaintiffs have shown (by the declaration of Scott A. Bailey, M.D.) that, without the necessary deposition testimony of Dr. Banks and Nurse Mello, at a minimum, Plaintiffs cannot currently present facts essential to justify its opposition at this time. (*See FRCP 56(d)*).

With respect to the Rule 56(d) considerations for denial or continuance to allow for the necessary discovery, Dr. Bailey's declaration has put forth 'facts indicating a *likelihood* that controverting evidence exists as to a material fact.' (See <u>Tatum v. City & County of San Francisco</u> (9th Cir. 2006) 441 F3d 1090, 1101; <u>Trask v. Franco</u> (10th Cir. 2006) 446 F3d 1036, 1042; <u>In re PHC, Inc. Shareholder Litig.</u> (1st Cir. 2014) 762 F3d 138, 143-144). Specifically, Dr. Bailey's declaration indicated he needed more

information from Dr. Banks and Nurse Mello before he could make a conclusive determination on whether Dr. Banks met the standard of care. He indicated the medical records, alone, were insufficient. (**See Bailey Decl. ¶7**). There was information that would need to be elicited during the depositions of Dr. Banks, Nurse Mello, and suitably knowledgeable representatives from Kaweah Delta Health, and Altura Health (on information and belief, Dr. Banks' then-employer). At a minimum, Dr. Bailey indicated those subjects included: (1) everything that Nurse Mello and Dr. Banks recall saying to one another regarding Ms. Nunez on 8/21/21; (2) which, if any, of Ms. Nunez' prior medical records were reasonably available to Dr. Banks on 8/21/21; (3) where Dr. Banks was physically located relative to Kaweah Delta Medical Center on 8/21/21 and when, if at all, she was present at Kaweah Delta Medical Center on 8/21/21; (4) the scope of Dr. Banks' responsibilities with regard to Kaweah Delta OB Triage patients as set forth in any contractual agreement between Altura Health and/or Dr. Banks and Kaweah Delta Medical Center/Kaweah Delta Health; and (5) what communications, if any, Dr. Banks had at any time with Ms. Nunez' regular prenatal providers at Kaweah Delta Health. (**See Bailey Decl. ¶7**). Based on the single elevated blood pressure reading, and the lack of a urine dipstick test, during Ms. Nunez' visit, Dr. Bailey believed there was a reasonable basis to believe that the further information to be elicited as described above will establish one or more standard of care violations by Dr. Banks that were a substantial factor in causing harm to Ms. Nunez and XBN. (**See Bailey Decl. ¶7**).

In terms of why '*specific reasons* why such evidence was not discovered or obtained earlier in the proceedings (i.e., "good cause")', Plaintiffs have not yet been provided the opportunity to depose Dr. Banks, Nurse Mello, or any of the persons most knowledgeable representatives Kaweah Delta Health and Altura Health, because there has been no opportunity to conduct discovery thus far. The instant summary judgment motion is Defendant, U.S.A.'s initial and responsive pleading to Plaintiff's complaint. Moreover, Defendants have known for many months that Plaintiffs were taking steps to

comply with FTCA procedure for the specific purpose of obtaining this very discovery. **(See Exs. 2 & 3)**. Further, *when no discovery has yet taken place,* specific reasons are not required, because the party making a Rule 56(d) motion "cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not been laid." (See <u>Burlington Northern Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation</u>, (9th Cir. 2003) 323 F3d 767, 774). Plaintiffs, in the instant case, have far exceeded this burden with the declaration of Dr. Bailey.

Once the related cases have been consolidated, and discovery commences, Plaintiffs will promptly notice and complete the depositions of Dr. Banks, Nurse Mello, and the persons most knowledgeable from Kaweah Delta Health and Altura Health to determine Dr. Banks' (and, thus, Defendant, U.S.A.'s) liability in this matter. Plaintiffs will then be in position to oppose the instant summary judgment motion, or alternatively dismiss the U.S.A. and move to remand this case back to state court against the remaining defendants. **(See Declaration of Jonathan R. Ehtessabian, ¶4)**.

## V.   CONCLUSION

For all of the reasons stated above, summary judgment should be denied, or the hearing date continued, because Plaintiffs have shown (through the declaration of Scott A. Bailey, M.D.) that, without the necessary deposition testimony of Dr. Banks and Nurse Mello, at a minimum, Plaintiffs cannot currently present facts essential to justify its opposition at this time. (*See FRCP 56(d)*).  As such, Plaintiffs respectfully request the Court deny Defendants' request for summary judgment/adjudication on issues 1.

Dated: July 23, 2024            KENNETH M. SIGELMAN & ASSOCIATES
                                JRE LAW FIRM, APC

                                By  <u>/s/ Jonathan R. Ehtessabian,, Esq.</u>
                                     KENNETH M. SIGELMAN
                                     MAX A. GRUENBERG
                                     JONATHAN R. EHTESSABIAN
                                     Attorneys for Plaintiffs